This is case number 409-388-0390617, McNeil v. Ketchens, appearance of Frederick Grosser for the appellant, and you are Mr. Whitney? Yes, sir. Okay, for appellant 0393, Mr. Grosser's appellee, and other Mr. Whitney. How do you propose to divide up your time, your counsel? In honor of the department, I would have 20 minutes, Mr. Whitney would have 20 minutes, and I would have 5 minutes for the bottom, and he would have 5 minutes for the top. Okay, then we'll let you proceed accordingly, you may proceed. Thank you. May it please the court, counsel, your honors, Judge Clem found as a fact that the intent of Mandy Starkey in her will was to convey the entire residence property of 609 Milton Street to her nieces, even though there was an omission of part of the legal description in her deed, in her will. Judge Clem found that the activities of Mr. Ketchens in the deeds were a sham, they required no interest. However, he declined to enter an order on those, because he raised the issue of standing and public policy. However, those weren't raised in any pleadings, they weren't raised in the trial court, they first appeared in Judge Clem's orders 8 months after the trial, and I think it would be inappropriate for them to be considered for the first time when I had no opportunity to respond to them. Had I had an opportunity to respond to them, clearly the McNeils had standing, they had an actual legitimate interest and an actual controversy that involved part of their front yard and part of their driveway. There's no public policy that I can find, and none actually identified by Judge Clem, that says he can't construe a will, and he construed the will, he can't correct the deed, the only deed that can be corrected is the last one, the McNeils. Everybody testified in court that this was their intent as sellers and buyers. Going on in this part of the case, adverse possession, there was an evidence deposition of Dr. and Mrs. Haight. They had a photograph showing their property, they drew a line showing where they believed the property line was. The same photograph was identified by every seller and buyer of the property, and by Bertie Bile, the fellow who owned the house next door, said that's where the line is, and that's where the line would be, but for the error in the legal description in the will, which then carried forward into all the documents. Nobody ever bothered to check, as you could today, and said well if the aerial photographs are things like that, that I think are or should be a routine part of a real estate transaction. What the defense argued was, well the Haights bought a new house and they moved out. As they're moving into the new house, they've got to give up their old house, and he says, we haven't established that there's no break in possession. That's not a break in possession. You sell your house, you have to move out before the closing. It doesn't matter whether it's a week before the closing. They exercised all of the elements of ownership of this property. By golly, they showed up at the closing and they signed the deed. Other than this alleged break in the housing or the occupation, was there any other problem that Judge Clem decided why adverse possession wasn't allowed? None that I recall. In fact, I believe under adverse possession it was actually complete in 1975 before this even occurred, because the problem started with the nieces of Mattie Starkey acquiring the property, and that's where the error in the will would first have had its effect. So even though we talked about going from the present time backward 20 years, we could have gone backward 35 years, whatever it would have been. I don't think, well, the defendant acknowledged the deed he got from Winkleman, and I can't imagine how they accomplished that, but a deed from Winkleman conveyed to them the property so that they could get a tax number. Their original idea for their scheme was payment of taxes, possession, trespass, that's their possession, and color of title. The sham deed was their color of title for seven years. When Joe Bavia got into the case a few months later, he filed amended pleadings and he took that out of it. I didn't know about that until it showed up in the pro se answer. I had no idea what any of this was with the permanent index number. A year later, I think it was, I went by the board review office and asked them to explain it to me. I had no involvement in anything concerning that, and I had no interest in it. Nothing to do with the counts that I filed. The deeds afterward, after the suits filed and the summonses issued, not only weren't from owners of all the owners, they're from people who the defendant claimed to be some of the intestate heirs, but he knew of the Illinois Supreme Court case, I think it was 1960, a 19th century Colorado case. Been held that way that long. You can't buy a deed, buy an interest in a property after litigation is pending, to claim you now own it, I think we should be looking at the facts as of the time of the claim. Where did the figure $20,500 come from regarding the amount of sanctions under Rule 137? Judge Clem calculated that based upon the evidence. It was the amount of legal fees for the motion to disqualify and the legal fees on the motion for sanctions and then court costs, not court costs, there were transcripts and some additional fees for depositions. I scheduled along with the hearing on the motion to disqualify. The catchings refused to appear. I filed an appropriate motion. In fact, while I'm on the point, I got a letter from Ms. Matuka, which is in the record, in which she says, catchings don't want to appear. They believe that if the judge disqualifies you, then they're not going to need to give depositions. Of course, the whole idea was get me out of the case at any cost. The judge ordered depositions to be taken on a certain date prior to the motion to I don't think the additional costs we got, but there was a transcript of the hearing on the motion for disqualify and part of the deposition costs. I have somewhere in here the exact breakdown, but that's the answer to your question. It came to $20,500.40, I believe it was. Was that the amount you requested? No. I requested that amount plus enhancements based upon two theories. One, which is from this court, the unusual nature of the case and the mental distress caused to the lawyer. They are attacking me in a way that would not only affect my ability to represent my clients, my reputation, could have resulted in discipline by ARDC, could have resulted in suspension by ARDC, if somebody believed this stuff that they made up just so they could get me out of the case because their lawyer withdrew. But you're not appealing the amount of that sanction, are you? That's correct, and neither are they. But there was an additional amount. I just want to make sure that I understand the procedural context. So because of the intentional nature of their conduct, there's the first district case that I cited, that old case, 70s I think it was, where the misconduct that leads to the 137 sanctions is intentional authorized enhancement. I asked for both of those. Judge Clem made no comment to them. He simply didn't award them. Rounding off to the nearest dollar, he awarded what? So this is essentially the out-of-pocket expenses and attorney fees and what? Out-of-pocket expenses of the McNeil's. To respond to the efforts to remove you. That's right. This is like 10 years into the case. I'd like to go on to the sanctions matter. As for disqualification, it was our position that it wasn't a proper part of the notice of appeal. Mr. Whitney then responded acknowledging that I was correct. It was not a proper part of the notice of appeal. This court has no jurisdiction to do anything on the denial of disqualification. I can address it if the court has any questions on it. Judge Clem was wrong in awarding sanctions, but they shouldn't have awarded sanctions against them. Each of the three of them was then blaming the other for what happened. Judge Clem found, and the record just screams this, there's no credible evidence to support any of this. It starts with Matuka has an affidavit from supervisor of assessments who later was discharged from Alfiezenson's office. Is that part of the record? No. I didn't think so. And Pedrick says that, Twist says that, Mintz says that, Chester says, oh this is going to help Broson in his case, which he's doing incidentally as a state's attorney, he's a written opinion that says that what Chester was asking the board of review to do was proper. None of it said anything about me. If it was all true, what's it got to do with me? It wasn't true. Mintz testified that Shayla called him, Shayla Matuka called him before the hearing and he told her it wasn't true. She talked to Joanne Chester before the hearing and said, I know Fred didn't do this stuff, but we're going to pursue this claim anyway because my clients want him off the case. They had evil motives at every step of this thing for all the years that it has gone on. Matuka did no research, she did no investigation, she asked me if I was the county attorney and I said no. I said 30 years ago I was an assistant state's attorney, that's what they call it in this county, but no I'm not in that office anymore. She argued with Judge Klan that I'm a county official knowing that I said I wasn't. She talked to nobody before she filed this, a couple people before the hearing. Mr. Whitney talked to nobody and said that. He didn't see any need to talk to witnesses, he didn't see any need to do discovery, and there's an item on his time record that he submitted that shows .6 hours, that would be 45 minutes, something like that, which included a conversation with Matuka and his research. He didn't need to do no research in this case, he said so. He showed up at the hearing and asked the judge to take judicial notice of the motion to disqualify, he's not putting on any evidence. The judge said that's not how it works, what I consider is what comes from the witness stand, that side of it, what comes from the witness stand. So Mr. Whitney got to call some witnesses, so he calls people I've got there. First witness is Joanne Chester, asked doesn't Grosser advise you on these things, no. He can see from the record, he's surprised. The court reporter puts in no, and he says no, question mark. Asked well doesn't he advise the board of review, no, and that's the way it went in that. If we affirm, what happens to this assessment of $20,500? Well, I expect that one or two or three of them will make some decision as to how they're going to pay it. It's a joint and several? Joint and several, which I'll address in just a moment, or if they don't want to do it voluntarily. I think as an attorney, they've got an obligation to comply with the court order. There's a 7th Circuit Court that says that, where the 7th Circuit revoked the license before the 7th Circuit of a lawyer who refused to pay a sanction. Joint and several, Mr. Whitney cites two cases. He cited these two cases in his motion for a stay in this court. I respond to say, those two cases don't talk about joint and several, but here's a case that does, and I cited it. There's a case directly in point where the trial court awarded sanctions under Rule 137 against lawyer and client, and it's affirmed by the appellate court. This court denied his motion for a stay. He said, these cases show with absolute certainty or something like that, that he's going to prevail on appeals for just giving my stay. Well, for whatever reason, the court just says, denied. This court doesn't usually give explanations of its rulings on motions, but he filed in his brief, cites the same two cases, took no note of my comment on them, but it is clear that joint and several sanctions are lawful. They don't take issue with whether it was appropriate if it's lawful. They simply say it's not lawful, and so I guess their idea is, send it back and let Judge Clem decide how much each of these three people should pay. Don't know what position that puts Mr. Whitney in with respect to his client saying, well, make him pay this amount, Judge, make me pay this amount. We'll probably try to dump it all on the cougar. That's all I had to say unless there are other questions. Okay, thank you, counsel. Mr. Whitney? Good morning, Your Honor. May it please the court, counsel. Addressing first the arguments raised regarding the case in chief, first of all, I would note that opposing counsel misrepresented the court's findings regarding Maddie Starkey's intent in the will. What the court says, and I believe this is on page 995 of the record, but it's in the court's order that's on appeal, it says that the will suggests that she intended to convey Track Day with 609 of West Stoughton. That's as far as the court went. So there was no finding regarding specifically what Maddie Starkey's intent was. That's as far as the court went. So that is a mischaracterization of the court's ruling with regard to that issue. But in any event, in this appeal, I would note that what plaintiffs focus on are conclusions made by the court that they lack standing and that public policy barred the court from reforming an old will, all intended to gloss over the fact that they failed to meet their burden of proving any legally cognizable interest to Track Day whatsoever. It was not conveyed. It was not in their chain of title. The only thing they had was to try to go back to the will and argue that because of history and that type of extrinsic evidence, that the court should somehow reform the will. What about the adverse possession claim? What problem did Judge Klem find with that other than the alleged break in continuous possession? Well, there was a break, and there was no uncertainty regarding that. I think that what the court said, and it was all in one paragraph in the ruling, was that the court found that Haight's testimony to be too vague and indefinite. And it is important to remember what the standard of proof is on an adverse possession claim. It is clear and convincing evidence. And the case that I cited, the General Iron Industries case, makes clear that an interruption of adverse possession of even one day is enough to break the chain. And if you think about, first of all, the fact that the law does not favor adverse possession, it would favor other evidence of title, other claims of title, that's why there's a clear and convincing evidence standard. I'm not sure what the idea of the break comes from here. Weren't they just moving out and having sold the property? What was the break in possession? The break in possession, well, first of all, opposing counsel says, well, people always move out before closing. In my experience, that's not always true. But in any event, in this case, it was a period, what the Haight said was it was sometime in January 1983 to February 25th, 1983. So it was somewhere between one and two months, approximately, that they were gone, all their property was gone, the house was sitting idle, abandoned for at least a month, possibly as long as two months. Had it not been sold? It, actually, I believe it had been sold, but no one had moved in. And I believe why the reason that the law in general iron industries favors that legal conclusion that even a break of one day is sufficient is because if you look at what is required, all the different elements of adverse possession, first of all, how can it be possession at all if the property has been abandoned, if no one's there? No one's asserting their right to this slice of property that's adjacent. I don't understand. You've used now that term twice, abandoned. How is this house abandoned if it's been sold and the owners have moved out until the purchasers move in? What makes that an abandoned house? Well, it's abandoned in the sense that there are no owners, no one is inhabiting the residence. Well, somebody has to own it. Sure, someone. So you said there were no owners? No one, there are no residents. No one is present on the property. So there's no possession. There's no possession because no one is physically there for a period of at least a month. So how can the possession be continuous? How can it be open? How can it be notorious? Who purchased it from the Hates? I'm sorry? Who purchased it from the Hates? I believe that was the Turners were in between the Hates. So if they had moved in the next day, there would be no adverse possession problems? Certainly, that would be a much closer case because then the open and notorious... How about the Hates moved out at three o'clock and the Turners moved in at five? Well, then that would be for the court to decide. I mean... Well, tell me, counsel. I would be the rule then. Would the adverse possession have been stopped? I think it would depend on the other facts and circumstances because what we're talking about is not the property itself, but the sliver adjacent to the property at 609 West Stoughton. So... So the answer is that it would still have been stopped? It would depend on whether they were asserting their possession of Tract A. That's really the issue here. It's not just whether... The issue is they moved out at three o'clock and the Purchasers moved in at five. The issue is, did that stop the adverse possession? And again, the best answer I'd give you is it would depend. If they put something... That's what it depends on. Well, if they put something... If they, for example, they put a vehicle in Tract A or if they put some other personal property on Tract A or they did something to assert their claim over Tract A, then yes, that probably would not be a sufficient break in the chain. But that's not the case here. In addition, of course, we also look at the uncertainty of what the hates testimony was regarding... They had a hard time recalling even where they lived during their deposition and, you know, to the extent to which they used the driveway and all this other facts. The court may have looked at that as well. But I think it is fair to say they looked at this period of a month to a month and a half. And again, the legal standard here is a high threshold, clear and convincing evidence, and it has to meet all of the elements, including continuous assertion of possession of this property, not just the residence, but Tract A. So for these reasons, and given what the precedent states under General Iron Industries and the other cases that we cited, I believe that the plaintiff failed to meet their burden of proof with regard to adverse possession. Yes, Mr. Grosser, I'll ask you too about the $20,500 sanction. Is my understanding correct that the amount of sanction is not on appeal? That is not on appeal. That's correct. So the question is whether it was appropriate or not, not the amount. Correct. And it is your position that it was not appropriate. Why? Well, it was not appropriate because the defendant and counsel, myself, have demonstrated that the amended motion to disqualify counsel, once it was narrowed to Rule 1.11 and the Rule in Lipinska, was grounded in fact and was based upon a good faith, either on existing law or a good faith argument for the extension of that law. Bear in mind that at the time of the amended motion, the defendant had in hand a certified statement from the township stating that Attorney Grosser, quote, is employed by the township. Now, if we compare this to the fact pattern in Lipinska. In Lipinska, we had an attorney for a small city small enough that he still maintained his own business and represented private paying clients. In the case of Barr, we have the attorney for a township small enough that he maintained his own business and represented private paying clients. The attorney in Lipinska undertakes a private matter where as counsel for a small city, he has a duty to be fair to both parties. That was unfamiliar and I think my colleagues are with all the circumstances of Lipinska. What isn't clear to me is how does any relevancy in the circumstances of Mr. Grosser in this case? Well, the... Explain that to me. Sure. The question is not only that what is analogous there, but the question posed in Lipinska is that there's a conflict when the private employment when an attorney undertakes private employment with respect to matters in which he has substantial responsibility as a public official. So what are those substantial responsibilities Mr. Grosser had in this case that his representation of the McNeils was affecting creating a conflict of interest? Well, first of all, your honor, I believe that the scope of Lipinska goes beyond just those facts. The... What essentially in Lipinska... Counsel, could you answer my question? Sure. The... Basically, it was the series of facts that we laid out. I think it's in page... It was in our brief, the series of seven facts we listed of the township assessor being involved in the case, same township assessor that Mr. Grosser had represented on a number of occasions with respect to tax matters that were at issue in the case in the initial part of the case. There was also the... The fact that he'd been copied on memoranda regarding that issue early on in the case. The fact that... Ms. Chester admitted having conversations with Attorney Grosser about that matter. The fact that Ms. Chester signed affidavits on behalf of the plaintiffs in the case, basically making assertions of fact that were disputed regarding the taxing history of Track Day. And we had contrary evidence regarding that. And then, of course, there was this statement of Kurt Diedrich, another public official, the county assessor. It was not as characterized by opposing counsel. The statement made a twist to means to Chester. It was double hearsay. It was not triple hearsay. But Mr. Twist also made the same statement, and that was admitted into evidence regarding in rebuttal testimony. And so you have a whole package of facts and circumstances indicating that the same township official that Mr. Grosser had represented on numerous occasions is now entering on the case on the side of the plaintiffs. How is the township involved in this case? Well, this is a township assessor. This is an official. It's not clear to me how the township or the township assessor plays any role in any of the issues in this case. What Ms. Chester did, among other things, is that she did issue an order, and this is not controverted, to change the taxing status of Track Day. So that my client, the defendant in this case, was no longer allowed to continue his practice of paying taxes on Track Day. It took it out of its status as a separate parcel. And so that was the nature of that involvement. How does that affect this litigation in any way? Ultimately, it ended up not affecting the litigation. Well, you say ultimately. At what point did it appear it possibly could affect the litigation? At the time of the motion for summary... So that this could be viewed as an appropriate step for you and other counsel to take? At the point in time of the motion for summary judgment, that was when the Chester affidavit was first written up, and plaintiffs were still taking the position that the tax issue was still relevant. So the contention was whether or not this was passed by deed or adverse possession? Is that right? That was the central issue, that there was also the 40-year rule regarding... There were other arguments that were still being raised at that time. The 40-year rule on whether or not you can bring a claim based on a deed. But, Your Honor, I would point out... Did this court view more strictly the sense of the obligation upon an attorney to clarify, to be pretty sure that counsel is accurate before filing a petition for... As here, they have opposing counsel discharged because of an ethical violation? I'm not sure I understand your question. Well, Rule 137 talks about checking things out to make sure that you're reasonably accurate and you have a good faith basis upon which to file pleadings. And I think that's generally true, but it seems to me that when you're saying that opposing counsel to be discharged because of an ethical conflict, shouldn't these standards be at their highest when we're talking about making sure that this is an accurate claim on the part of the attorney filing such a document? That they have to meet the standard required by Rule 137, I would absolutely agree. And that means that it's required to show a basis in fact and a good faith belief either that it comes under existing law or a good faith extension or a good faith argument for the extension of that law. Which in this case, Your Honor, I would point out that the Supreme Court's rule in Lipinska was not limited to those facts. Language in Lipinska made it very clear that the Illinois Supreme Court took the view that an attorney should not get into a position which might subject him to conflicting duties. It was not limited to that narrow set of facts. In essence, the language of that ruling makes it clear that an attorney who's representing a public entity, a municipality in that case, a township in this case, should essentially avoid even an appearance of impropriety because of his duty to all parties within the jurisdiction that he is representing. That's the argument for the good faith extension of the law and we can find that in the language of Lipinska itself where it says a public officer owes an undivided duty to the public whom he serves and is not permitted to place himself in a position which will subject him to conflicting duties or expose him to the temptation of acting in any manner other than the best interest of the public. That's the broader rule, what I've described as a prophylactic rule, which I believe is part of the rule in Lipinska. So, my argument is not that we had to demonstrate the same type of direct conflict that was admittedly more present in Lipinska, but that we have to read this broadly as the Illinois Supreme Court suggested it should be read broadly. Do not put yourself in a position where there might be a conflict. That was the fundamental basis and we did have a factual basis to find that that potential conflict existed because it was admitted, it was never denied, that Mr. Grosser was the attorney for the township for many, many years. The township itself, he even used the term employed because it had been such an ongoing relationship and he was in a position where he might be subjected to these conflicting duties. That's the good faith basis for the extension of the law that we believe that Lipinska should be read more broadly. Now, having said that, I would like to also point out to the court with respect to my client that he relied on the advice of counsel consistently throughout this as he testified. I'm out of time. What he testified to was that when he first approached Ms. Matuka, he thought that she was going to work on a motion to dismiss. Nothing about any motion to disqualify an attorney until the day it happens and she surprises him with this. Okay, so at a minimum, I don't see where the court found grounds to impose sanctions on the defendants in this case. But apart from that, opposing counsel says, well, we don't deny that sanctions are appropriate. We do deny that sanctions are appropriate. Yes, Ms. Matuka in her initial pleading included a lot of things that were not well grounded. But within that, and by the time of the amended motion, there was an indirect citation to Lipinska and when I looked at that, I saw, yes, read broadly, this applies, this should be grounds for disqualification and we already have the facts of the relationship between Mr. Grosser and the township and the township assessor. Some other things that were raised in the course of argument on this citation of 0.59 hours of research, that's already been refuted. It was pointed out to the court as part of the record. That was one item in my billing statement. There was another item where I was preparing the motion or the reply and memorandum on the motion, but it took seven hours. That was included in the research. I don't know why they keep bringing up this 0.59 hours. He mentioned that the record indicates that I was surprised by some of the testimony of the witnesses. It is precisely because I believed in this broader view of Lipinska, may I complete my sentence? Yes. That I actually believed that the court would rule that based on Lipinska alone and the fact that Mr. Grosser was the township attorney that we had enough to justify disqualification. It was not just me. It was only after that that I realized, okay, we need to show apparently the court wants to see more of a nexus. Thank you, counsel. You have a chance to address us about Mr. Grosser. You've seen that entire note that's on Matooka. Dr. Haight wasn't confused about where he lived. He wasn't confused about where the line was. The record shows this photograph. He drew the line. Three later witnesses said, yes, that's where the line is. That's the property line. We didn't ask to have the will reform. We asked to have the judge construe it, determine what it is she intended and play games with the words. But the judge concluded, and I think it's only a reasonable conclusion if you read the whole thing, especially where she says, I'm conveying all of my real property. I don't need a residuary clause for real estate that she had one for personal property. That's what she intended. Justice Appleton said a few minutes ago, somebody had to own it, and that's absolutely correct. But this piece of property, either today the McNeills own it or 26 people out there, organizations, if you follow through the record, own little tiny pieces of this little piece of land. This is a chancery proceeding. He says his motion was never narrow it. Well, that isn't so. He cited various violations, said I shouldn't be this because I'm to be a witness even though I wasn't on anybody's witness list. The urban city clerk functions as the township clerk. The fact that she answers a question that says he's employed by the township doesn't mean this is a legal determination. Judge Clement made the legal determination based upon actual evidence and actual law. And it's important to note that the township is not a municipality. A city attorney who is on the city staff in charge of the city legal department, similarly to the state's attorney for the county, is very different than a little unit of local government. And there's a case cited that talks about this. The township was a client of mine. I didn't direct its activities. I didn't direct its legal affairs. But I had nothing to do with these matters. I was involved in poverty tax appeal board matters before the Omaha Department of Revenue and occasionally before the circuit court and at least once before this court for the township. That was my involvement in those things. It would involve only commercial properties. He says that there is some letter verifying this. There is a letter that shows a copy to me by Joanne Chester about 12 years ago, which is asking about the exemption statements on deeds. And she called me and says, under subsection D, what does that mean? And I said, it refers to a deed which replaces a prior deed so you don't have to pay taxes. I see my time is up. No, it isn't. You have two minutes so the red light goes off. OK, I will continue. I tried to make good use of that time. Mintz testified and Mintz said, this stuff isn't true. Not that it had anything to do with me but that's what the record shows. The taxi matter, I wasn't making it relevant. I didn't even know what it was about and Pevea withdrew it. There was a comment in a motion hearing oh, I don't know, four years ago, six years ago, addressing it. There's a spot in the record where Mr. Whitney says that what he thinks is most significant is I was the attorney for the township for 27 years. As I said in the record, that leads to one of two conclusions. Either they liked me and didn't pay me very much or it was just too much trouble and not worth the bother to go looking for another attorney who could do this kind of work. Thank you, counsel. Mr. Whitney? Yes, thank you, your honors. First of all, I believe that opposing counsel is mischaracterizing the evidence when he said that Mr. Means' testimony was that none of this was true. What Mr. Means testified to, and of course the record will clarify this, is that he was asked by Joanne Chester to delete the permanent index number to track day and that the litigation was mentioned. What he denied was the statement attributed later to Mr. Diedrich that she had asked him to do this in order to assist Mr. Grosser and his clients in the case. He did deny that part of it, but he didn't deny deleting the parcel number of the very subject property in this case at the request of township assessor Joanne Chester. I do need to correct one point that was raised earlier. I made a mistake  of characterizing the record and I do not have the record cited at this time, but I should point out to the court that it was not established that the Hates had actually sold the home before they left the home. It was sold to the Turners, but I don't believe anywhere in the record was it established that that sale took place before they left. And obviously the court will have to sort that out, but I was mistaken on that. I don't believe there's anything that was never proved that that sale took place before they left the property at 609 West Stoughton. With respect to the question of the nexus between Mr. Grosser's representation of the township and the things that occurred in this case, what I intended to do was refer the court to pages 39 and 40 of the brief, which lists a series of seven facts that the defendant and his then attorney had in front of them at the time of the original motion, and then of course by the time of the later motion they also had the statement from the township clerk indicating that Mr. Grosser had been employed by the township. So those were the things that were present at the time. Again, with respect to adverse possession, the General Iron Industries and the other cases are at blinding precedence of this court. I believe it makes very clear that any interruption is sufficient to break the chain of adverse possession. Addressing one other point that I didn't get to on my initial presentation, regarding this issue of joint and several liability, yes, it is true that there were cases that were cited that said that it would be appropriate. However, the Levin case that we cite at page 48 of our principle brief in the sanctions case makes very clear that in reviewing Rule 137 that the rule is penal in nature and not based upon common law of tort principles. Therefore, the concepts of contribution among joint tort feasors and joint liability are inapplicable. This is a more recent case than the cases that I think was the 1992 case cited by opposing counsel. At a minimum, it would seem to me that the Illinois Appellate Court will have to resolve this apparent conflict. But what I would suggest to the court is that in the Levin case, the court looked more carefully at the purposes and the policies underlying Rule 137 and it was on that basis that they came to that conclusion. This obviously is something for the court to sort out, but I believe that Levin was rightly decided and therefore joint and several liability is inapplicable to Rule 137 sanctions. Also, with respect to the argument raised during opposing counsel's initial presentation, it seemed that a lot of that on the sanctions was arguing Attorney Matuka's faults and what she did not do. She is not here before the court. She did not appeal this decision. And so I'm not sure why that's in any way relevant. What is relevant is the fact that the defendant in this case relied on her, was surprised by what she did at the time, then relied on me. And I did narrow the issue primarily to that Lipinska case and discharged the other grounds. And accordingly, sanctions, I would submit, are inappropriate.